# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AFREEN KAELBLE,<br><br>Plaintiff,<br><br>v.<br><br>TULARE COUNTY AND TIM WARD,<br><br>Defendants. | 1:14-cv-1750-LJO-SAB<br><br>**MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 13)** |

## I. **INTRODUCTION**

Plaintiff Afreen Kaelble, a former Supervising Deputy District Attorney ("SDDA") for the Tulare County's District Attorney's Office, brings this civil rights case against Tulare County ("the County") and Tulare County District Attorney Tim Ward under 42 U.S.C. § 1983 ("§ 1983").[1] Plaintiff alleges the County and Ward unlawfully terminated for her political activities in violation of her First Amendment rights. *See* SAC at ¶¶ 35-36.

Defendants move for summary judgment on the claim. Doc. 13 at 21. The Court took the matter under submission on the papers pursuant to Local Rule 230(g). Doc. 35. For the following reasons, the Court GRANTS the motion in Defendants' favor and against Plaintiff.

---

[1] Plaintiff also alleged claims against both the County and Ward for "unlawful influence on political activity" and for violation of Article I of the California Constitution. Doc. 1 at 29. Plaintiff does not oppose Defendants' motion for summary judgment on those claims, nor does she oppose Ward's motion for summary judgment on Plaintiff's § 1983 claim. *See* Doc. 29 ("Plaintiff opposes [Defendants' motion for summary judgment] only as to the third cause of action, for the County's violation of 42 U.S.C. § 1983."); *see also id.* at 23 (Plaintiff concluding only that summary judgment is inappropriate as to her § 1983 claim against the County). Further, Plaintiff does not oppose Ward's assertion that he is entitled to qualified immunity from Plaintiff's § 1983 claim. The Court therefore GRANTS (1) Defendants' motion for summary judgment on Plaintiff's first and second causes action and (2) Ward's motion for summary judgment on Plaintiff's § 1983 claim against him, including Plaintiff's claim for punitive damages against Ward. Accordingly, the Court need only address Plaintiff's § 1983 claim against the County.

## II. <u>RULING ON OBJECTIONS</u>

The Court notes at the outset that the parties have lodged approximately 100 objections to the opposing party's evidence. *See generally* Docs. 29-3, 32. Aside from Defendants' three objections to Plaintiff's deposition testimony, the parties object only to declaration testimony. The problem with all but one of Plaintiff's 46 objections is Plaintiff block quotes entire paragraphs from Defendants' proffered declarations and states three to four objections without any explanation of which objection pertains to which statement. Defendants do the same at times. As to these objections, the Court is left to guess which objection applies to which statement.

Nonetheless, the Court has carefully reviewed the objections it could discern and need only consider them to the extent the objected-to evidence is material to the Court's ruling. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (en banc) (holding district court "must also rule on evidentiary objections that are material to its ruling"). The parties' objections are OVERRULED unless otherwise indicated, either explicitly or by the Court's not addressing objected-to evidence below.

## III. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

The following facts are undisputed. Plaintiff and her husband, Ralph Kaelble, are former employees of the Tulare County District Attorney's Office ("the Office"). Doc. 31, Defendants' Reply to Plaintiff's Response to Defendants' Separate Statement of Undisputed Material Facts ("UMF"), No. 1. Ward became their supervisor when he was appointed DA in December 2012 after his predecessor retired. UMF 4. In January 2013, he terminated Mr. Kaelble. UMF 4, 20; Doc. 15-2, Ex. H, Declaration of Hon. Robert Anthony Fultz ("Fultz Decl."), at ¶ 4.

Shortly after his termination, Mr. Kaelble decided to run against Ward for County DA, which held an election for the position in June 2014. UMF 5; *see also* Doc. 15-1, Ex. R at 1. Members of the Office learned about Mr. Kaelble's candidacy between April and June 2013. UMF 24. He officially announced his candidacy in June of 2013. *See* Doc. 15-2, Ex. G, Declaration of Tim Ward ("Ward Decl.") at ¶ 8. Plaintiff never discussed the election at work and did not openly and publicly support Mr.

Kaelble's campaign until November 2013, when she marched in three parades holding a banner that said

something to the effect of: "Ralph F. Kaelble for Tulare County District Attorney." Ward Decl. at ¶ 9;

Doc. 29-1, Ex. B, Declaration of Michelle Wallis ("Wallis Decl.") at 2:17-20; Kaelble Decl. at ¶ 42.

Office personnel, however, assumed she had always supported his campaign. Mr. Kaelble ultimately lost

the election to Ward. UMF 5.

Plaintiff joined the Office in 1999 and became an SDDA in December 2006. Kaelble Decl. at ¶

3. At all relevant times, Plaintiff was a SDDA responsible for supervising six Deputy District Attorneys

("DDA") and made over $100,000 per year. Kaelble Decl. at ¶ 6; UMF 15. At various times, Plaintiff

supervised the General Felony Team, the Community Protection Team, and the Financial Crimes

Division. Doc. 15-1, Ex. S, at 2. Plaintiff became the SDDA in charge of the Juvenile Division at some

point between August and September 2013.[2] SDDAs serve at the pleasure of the DA; they have no

property rights in their at-will positions. UMF 12, 13.

The County's job description for SDDAs defines the position as follows: "To plan, assign and

supervise the work of subordinate attorneys in the District Attorney's . . . Office and personally

prosecute . . . felony and criminal cases. Doc. 29-1, Ex. I ("SDDA Job Description") at 1. The SDDA

Job Description defines an SDDA's duties as follows:

DUTIES may include, but are not necessarily limited to: Assign and supervise the work of
subordinate attorneys . . .  assist subordinates in determinations as to the prosecution or defense;
try cases in the Superior Court; prepare trial briefs; conduct legal research; check questions of
law; advise clients of legal procedures; prepare or reply to correspondence concerning criminal
and other legal matters; evaluate and prepare critiques of all trial attorney performances;
interview witnesses; appear as counsel at arraignments, preliminary hearings, motions and trials;
advise the general public and law enforcement officers on criminal proceedings; review and
evaluate the more difficult cases; prepare and write reports.

Perform related duties as assigned. []Essential duties may vary from position to position within
this classification.

---

[2] The record is not clear as to when exactly this occurred. Plaintiff testified that she had been the supervisor of the Juvenile
Division for approximately three or four months prior to her November 2013 termination, Kaelble Depo. at 17:25-18:5, and
Ward described the decision to transfer her to that position only as occurring in "summer of 2013." Ward Depo. at 60:15-20.

*Id.* In addition, SDDAs "may act as chief trial attorney in the most difficult cases." *Id.* SDDAs must have the ability to "develop, implement, and interpret policies and procedures," *id.* at 1-2, and must have at least five years of experience as an attorney, at least four years practicing criminal law, and at least one year performing supervisory responsibilities. *Id.* at 2.

SDDAs manage their separate divisions and supervise the attorneys in those divisions. Greaver Decl. at ¶ 3; Lopez Decl. at ¶ 3; Alavezos Decl. at ¶ 4; Kaelbe Depo. at 56:3-5; Kaelble Decl. at ¶ 6. Although SDDAs can implement policies with respect to their division, they cannot unilaterally create or implement Office-wide policies. Fultz Depo. at 7:16-22; Ward Depo. at 9:13-17; Kaelble Decl. at ¶ 6. Nor can they hire, fire, promote, or demote any Office employee, though they evaluated personnel in their divisions. UMF 16. SDDAs also are not permitted to speak to the media on behalf of the Office without approval from either the DA, an ADA, or the Chief Investigator. *See* Ward Depo. 65:21-67:8; Kaelble Decl. at ¶ 13.

Nonetheless, SDDAs have "a broad range of responsibility and must exercise discretion and implement policy in order to successfully perform the essential functions of their job." Kaelble Decl. at ¶ 12; UMF 16. For instance, SDDA David Alavezos "could decide whether to pay for a witness to come to trial and whether a suspect should be extradited from another state for prosecution." Alavezos Decl. at ¶ 4. SDDAs also may decide to dismiss a case unilaterally, though they usually must receive approval before dismissing a case. *See* Kaelble Depo. at 45:25-46:3; Doc. 15-1, Ex. KK at 2 (Plaintiff stating in her journal on October 4, 2013: "I also made a dismissal decision w/o them since they won't talk to me"). Similarly, SDDAs have discretion as to how and when to bring a case, how to charge a case, when and how to plea bargain, and who is assigned to a case. Lopez Decl. at ¶ 1; Kaelble Depo. at 125:20-21; Ward Decl. at ¶ 16; Greaver Decl. at ¶ 3; Fultz Decl. at ¶ 3. One example of Plaintiff's case oversight responsibilities was her role as Office coordinator for case conflicts. Kaelble Decl. at ¶ 27. The County and "three or four" other counties' DA offices have an agreement to handle one another's cases when conflicted, if possible. *Id.* Plaintiff would coordinate and communicate information concerning the cases

1    between the offices, including deciding who was assigned to the case. *Id.*

2          As an SDDA, Plaintiff was part of the DA's management team, which included, among others,

3    the DA, two Assistant District Attorneys ("ADA"), nine SDDAs, the Chief Investigator, two Assistant

4    Chief Investigators, and a representative from Victims Services. UMF 9; Kaelble Decl. at ¶ 10; Ward

5    Decl. at ¶ 6. The management team held regularly[3] scheduled meetings where they discussed, among

6    other things, sensitive and confidential information concerning Office policies and procedures, case

7    management and strategies, investigations, personnel issues, workplace issues, and matters generally

8    involving Office operations.[4] The discussions at the meetings were expected to be open, candid, and

9    confidential.[5] In addition, the management team went on an annual "retreat," where they discussed the

10   Office in confidence. Kaelble Depo. at 135:22-25. The confidentiality of all management team meetings

11   was stressed repeatedly. Kaelble Depo. at 120:11-15. To that end, management team members had to

12   trust one another to ensure a candid, free flow of information in order to efficiently run the Office.

---

14   [3] Plaintiff disputes whether the meetings were held "regularly." *See* UMF 10. Plaintiff's dispute, however, is one of semantics—there is no dispute that the management team met often and held numerous meetings. Plaintiff states that, "[a]t

15   most, meetings are held once a week," UMF 10, and agreed in her deposition that the management team met "regularly." Kaelble Depo. at 62:7-9.

16   [4] At times, Plaintiff strenuously disputes that the management team discussed sensitive and confidential matters at the meetings. She contends that the meetings were "primarily informational" and that the "majority" of issues involving sensitive

17   and confidential information were discussed in smaller groups or one-on-one. Kaelble Decl. ¶¶ 10-11. Plaintiff argues that "[i]t would be impossible for a group of 18 people to discuss every single issue that arises given . . . time constraints." *Id.* at ¶

18   10. Plaintiff mischaracterizes Defendants' representation of the nature of the management team meetings. Defendants do not argue that every member of the management team was at every meeting and that the team discussed exclusively sensitive and confidential information at every meeting. Defendants only argue that this kind of information *was* discussed at the meetings

19   and that the meetings were held so that it *could* be discussed in confidence—a contention Plaintiff does not dispute. *See* Kaelble Depo. at 119:9-12, 22-25 (Plaintiff acknowledging that "[t]here may have been some confidential information"

20   discussed "[a]t times" at the meetings); *see also* Kaelble Depo. at ¶ 10 (Plaintiff testifying that "if an issue was more universal, then it might be discussed in a management meeting"); *id.* at ¶ 11 ("At times members of the Executive

21   Management Team will assign [SDDAs] to work on projects and propose those ideas during the management meetings"). Moreover, Plaintiff does not dispute that *all* the information was supposed to be kept confidential in the managers meeting." Kaelble Depo. at 120:11-13 (emphasis added).

22
     [5] *See* Ward Decl. at ¶ 6; Fultz Decl. at ¶ 3; Doc. 15, Ex. I, Declaration of Robert J. French ("French Decl."), at ¶ 1; Doc. 15,

23   Ex. J, Declaration of David L. Alavezos ("Alavezos Decl."), at ¶ 3; Doc. 15, Ex. K, Declaration of Gil Cardenas ("Cardenas Decl."), at ¶ 2; Doc. 15, Ex. L, Declaration of Kerri Lopez ("Lopez Decl."), at ¶ 3;  Doc. 15, Ex. M, Declaration of Jennifer

24   Lightfoot ("Lightfood Decl."), at ¶ 2; Doc. 15, Ex. JJ, Declaration of Daniel Underwood ("Underwood Decl."), at ¶ 3; Doc. 15, Ex. LL, Declaration of Barbara Greaver ("Greaver Decl."), at ¶ 2; Kaelble Depo. at 120:1-25; *id.* at 124:19-23; Doc. 15-1, Ex. KK at 5 (Plaintiff stating in her journal that she was told information shared at a management team meeting about an

25   individual returning to the Office was confidential).

1  Kaelble Depo. at 121:24-122:1; *id.* at 124:24-125:3 (Plaintiff agreeing that the DA "had to have

2  confidence that supervisors would maintain confidentiality of things discussed in the managers

3  meetings").

4       Ward depended on the input of the management team, including all SDDAs, in managing the

5  Office. Ward Decl. at ¶ 16; *see also* Doc. 15-1, Ex. W at 2 (Plaintiff's May 2013 performance review

6  stating Plaintiff "is trusted with important information relating to the management of the office").

7  However, all Office-wide decisions, policies, and protocols affecting the direction of the Office

8  ultimately were formulated and approved by the DA's executive management team, which at all relevant

9  times consisted of Ward, ADAs Hon. Robert Fultz and Daniel Underwood, and Chief Investigator

10  Robert French. *See* UMF 10, 11; Ward Depo. at 32:19-33:4. Although the executive management team

11  ultimately made the final decision on Office-wide policies and procedures, SDDAs provided their input

12  on those decisions and also developed Office-wide policy proposals for the executive management

13  team's approval. Greaver Decl. at ¶ 3; Ward Decl. at ¶ 6; Fultz Decl. at ¶ 7; Kaelble Depo. at 65:15-25,

14  71:20-24; Doc. 15-1, Ex. W at 2.

15       Plaintiff did so for a number of Office policies. In 2008, Plaintiff helped create the Office's

16  "Sensitive Information/Brady Database," was "in charge" of it since it was established in 2010, and was

17  "in charge of committee that was tasked with developing procedures for" it. Doc. 15-1, Ex. V at 2; Doc.

18  15-1, Ex. S at 1.[6] Beginning in November 2012, Plaintiff helped to develop the Office's policy

19  concerning Proposition 36 ("Prop 36").[7] Doc. 15-1, Ex. S at 1; Kaelble Depo. at 15-20. In doing so,

20  Plaintiff met with representatives from the Superior Court, probation, and the public defender. Doc. 15-

21  1, Ex. S at 1. Plaintiff "developed policy for [the] Office" and "handled all of the petitions for

22  _____

23  [6] The Database is "kept to ensure that exculpatory information within our possession regarding potential witnesses is disclosed to the defense." Doc. 15-1, Ex. Q at 1.

24  [7] Prop 36 permitted incarcerated individuals to petition the court for re-sentencing under certain circumstances. The full nature of Prop 36 is not relevant to this case.

25

1  resentencing [under Prop 36] that [were] filed in the [C]ounty." *Id.*; Doc. 15-1, Ex. W at 2 (Plaintiff

2  "outlin[ed] and creat[ed] the county-wide policy for the [Prop 36] resentencings"). At some time in 2012

3  or 2013, Plaintiff was assigned "to update eavesdropping protocols" for the Office. Kaelble Decl. at ¶

4  24; Doc. 15-1, Ex. S at 1. This required her to "read over an old protocol and read the Penal Code to

5  make sure it was correct." Kaelble Decl. at ¶ 24. Finally, Plaintiff helped to created proposed policies

6  concerning "Marsy's Law," and "U Visas," though the record contains no meaningful explanation as to

7  what this entailed. UMF 16; Doc. 15-1, Ex. T at 1; Doc. 15-1, Ex. U at 1; Kaelble Depo. at 79:25-80:7,

8  139:21-140:5.

9         Although Plaintiff always performed her job satisfactorily, Mr. Kaelble's candidacy affected the

10  ability of Office personnel—in particular, members of the management team—to speak with Plaintiff

11  candidly and in confidence. *See, e.g.*, Ward Decl. at ¶ 13. After Mr. Kaelble's election campaign became

12  known, Plaintiff "felt that [she] was being isolated and that [she] was not receiving information the same

13  way that [she] used to." Kaelble Depo. at 119:13-14. Plaintiff believed some Office personnel began to

14  not trust her around January or February 2013, shortly after Mr. Kaelble was terminated. *See* Kaelble

15  Depo. at 145:21-25.

16         Members of the management team did, in fact, grow to distrust Plaintiff. *See, e.g.*, Fultz Decl. at

17  ¶ 9; Ward Decl. at ¶ 13; French Decl. at ¶ 3. At least eight other members of the management team

18  testified that, because of Plaintiff's relationship to Mr. Kaelble, they could no longer trust Plaintiff with

19  confidential information concerning the Office due to their concern that she would share the information

20  with Mr. Kaelble.[8] Some management team members were concerned that confidential information

21  could become a campaign issue. *See, e.g.*, Greaver Decl. at ¶ 4; Alavezos Decl. at ¶ 6; Ward Decl. at ¶

22  13; Fultz Decl. at ¶ 8; Ward Depo. at 41:1-4. This was compounded by the fact that Mr. Kaelble had

23  accepted a position as conflicts defense counsel with the County, which some Office personnel believed

24  _____

25  [8] *See, e.g.*, Ward Decl. at ¶¶ 10, 13; Fultz Decl. at ¶¶ 8-9; French Decl. at ¶¶ 3-4; Alavezos Decl. at ¶ 6; Cardenas Decl. at ¶ 3; Lopez Decl. at ¶ 3; Lightfoot Decl. at ¶ 3; Greaver Decl. at ¶¶ 4-5.

1  potentially could have created conflicts of interest with the Office. Fultz Decl. at ¶ 9; Kaelble Depo. at

2  112:13-22. Plaintiff did not inform anyone in the Office that Mr. Kaelble had applied for the conflicts

3  position because she was concerned that someone would try to "sabotage his efforts." Kaelble Depo. at

4  109:2-4. Eventually, members of the management team, including Ward, grew to distrust Plaintiff and

5  she grew to distrust them. [9] UMF 28.[10]

6      Members of the management team felt that the nature and atmosphere of management team

7  meetings changed when Plaintiff was present.[11] They believed that discussions were no longer open and

8  candid, as they were intended to be; team members appeared to stop speaking freely and were guarded.[12]

9  This caused the productivity and efficiency of the Office to decline throughout 2013 because it (1)

10  _____

11  [9] Plaintiff apparently disputes this UMF, but does so only by discussing things that have no bearing on the trust issues in the
12  Office, namely, that she liked her job and was unhappy that it seemed at risk. *See* UMF 28. Accordingly, there is no dispute
    that members of the management team and Plaintiff did not trust one another.

13  [10] *See also* Doc. 15-1, Ex. W at 8 (Plaintiff stating: "I was isolated from other staff. People did not confide in me."); Doc. 15-
    1, Ex. KK at 1 (Plaintiff stating in her journal: "I can't talk to anyone about how I feel because I cannot trust any of them.");
14  Kaelble Depo. at 57:25-26:1 ("I just felt that I didn't know who I could trust anymore and I didn't know what was happening
    in the office."); *id.* at 93:16-17 ("I don't really feel like I could trust anyone at that time after my husband had been fired.");
15  *id.* at 26:4-13 (Plaintiff testifying that she documented in her journal on January 9, 2013, that she could not trust Fultz); *id.* at
    32:24-33:2 (Plaintiff testifying that she documented in her journal on January 23, 2013, that she did not "trust any of these
16  people [in the Office] at all"); *id.* at 145:21-25 (Plaintiff testifying that she grew to believe Office personnel did not trust her
    beginning "around January or February 2013"); *id.* at 116:24-117:15; Ward Decl. at ¶ 13 ("I could no longer trust [Plaintiff]
    to be forthcoming, cooperative, loyal and a team player."); Ward Depo. at 35:4-40:4; Fultz Depo. at 8:16-18 ("From my
17  perspective, I did not believe she was in a position to maintain the confidential trust of the executive management team.").

18  [11] *See* Ward Decl. at ¶ 10 ("I personally observed a level of restraint at [management team] meetings that I had not noticed
    before."); Lightfoot Decl. at ¶ 3 ("It was my opinion that management meetings were not running efficiently with [Plaintiff]
    present"); Fultz Decl. at ¶ 10 ("I observed that the free flow of information and open discussions [at the management team
19  meetings] stopped."); Greaver Decl. at ¶ 4 ("I was not as candid in our [management team] meetings because I was
    concerned that if I brought up confidential issues . . . the information would be shared with Ralph Kaelble . . . . I was guarded
20  in my comments, and I observed that others were as well. The free exchange of information I was accustomed to was
    diminished, as was the efficiency of Office operations."); Lopez Decl. at ¶ 3 ("I expressed to . . . Underwood during the
21  summer of 2013 that I was not willing to speak freely at management meetings if [Plaintiff] was present."); Underwood Decl.
    at ¶ 10 ("After it was common knowledge that Ralph Kaelble would run against Tim Ward, the atmosphere in the
    management meetings changed. I observed that the free flow of information and open discussions stopped."); French Decl. at
22  ¶ 3 ("The meetings had been uncomfortable after Jenkins and Ralph Kaelble were terminated, but the meetings took on a new
    atmosphere after Ralph announced his candidacy. The meetings became more like a short briefing than a candid discussion of
23  Office operations as they had been in the past. Team members stopped discussing issues with me at the weekly meetings and
    began coming to me privately to discuss matters.").

24  [12] *See supra* n. 11; UMF 29; Ward Decl. at ¶¶ 10, 13; Fultz Decl. at ¶¶ 8-9; French Decl. at ¶¶ 3-4; Alavezos Decl. at ¶¶ 6-7;
    Cardenas Decl. at ¶ 3; Lopez Decl. at ¶ 3; Lightfoot Decl. at ¶ 3; Greaver Decl. at ¶¶ 4-5; Underwood Decl. at ¶ 10; Doc. 15-
25  1, Ex. Q at 1 ("This unwillingness [of management team members] to speak freely, in my estimation, has hampered the frank
    manner of discussion that these meetings require.").

1   forced management team members to have more meetings in smaller groups, which was more time-

2   consuming; (2) required decisions to be made without full input from all management members; (3)

3   prevented Plaintiff from being fully apprised and informed of necessary information; and (4) delayed

4   decision-making and the resolution of Office problems.[13]

5        Ward, however, could not recall any specific information that could not be shared or any

6   assignment that could not be accomplished because of Plaintiff's presence. *See* Ward Depo. at 40:8-25,

7   41:1-120. The Honorable Robert Fultz, who was an ADA at all relevant times, also could not recall any

8   particular policy the Office could not create due to Plaintiff's presence, but had a "general concern"

9   about sharing information with her concerning the Marsy's Law policy with which she was involved.

10  Doc. 29-1, Ex. F, Deposition of Hon. Robert Fultz ("Fultz Depo."), at 11:10-12:19.

11       Management team members' trust and communication issues with Plaintiff persisted throughout

12  the summer and fall of 2013. Both ADA Fultz and ADA Daniel Underwood relayed their concerns with

13  Plaintiff to Ward. *See* Fultz Decl. at ¶¶ 10, 12; Underwood Decl. at ¶¶ 12-13. They reported that they

14  had become concerned with the effect of Plaintiff's presence at the management team meetings on

15  themselves and others. *See* Ward Decl. at ¶¶ 10-12; Fultz Decl. at ¶ 10; Underwood Decl. at ¶ 12. They

16  discussed with Ward that they and other SDDAs had concerns about being unable to speak candidly at

17  management team meetings in Plaintiff's presence. *See* Ward Decl. at ¶¶ 10, 12; Fultz Decl. at ¶ 10;

18  Underwood Decl. at ¶ 10[14]; *see also* Fultz Depo. at 9:18-21; Underwood Depo. at 10:17-25.

19

20  [13] *See* UMF 31; Ward Decl. at ¶¶ 10, 12, 14; Fultz Decl. at ¶¶ 3, 10; French Decl. at ¶¶ 3-4; Alavezos Decl. at ¶ 7; Lopez

21  Decl. at ¶ 3; Lightfoot Decl. at ¶¶ 3-4; Underwood Decl. at ¶¶ 10-11, 13; Greaver Decl. at ¶¶ 4-7; Doc. 15-1, Ex. V at 2 (Plaintiff stating: "I am not kept in the loop. Supervisors and line deputies have asked me if I know about specific cases, investigations, projects, and issues, but in most cases, I do not know what they are talking about."); *id.* at 57:25-26:1

22  (Plaintiff stating "I just felt that I didn't know who I could trust anymore and I didn't know what was happening in the office").

23  [14] Plaintiff objects to this declaration evidence as inadmissible, though, as noted, the grounds for Plaintiff's objections are not

24  clear. But, the only potentially viable objection to the material objected-to evidence is on hearsay grounds. Ward's, Fultz's and Underwood's statements that SDDAs told them they had concerns about working with Plaintiff are inadmissible hearsay to the extent they are proffered for the truth of the matter asserted. They are admissible, however, as non-hearsay for their potential effect on Ward, Fultz, and Underwood, who, as discussed below, conferred and agreed that Plaintiff should be

25  terminated based, in part, on the perceived negative effect she had on the management team and its meetings, namely, that

In July 2013, Ward considered whether he should terminate Plaintiff. *See* Ward Decl. at ¶ 11. He had discussions with his executive team about her perceived negative effect on the management team. Ward Decl. at ¶ 14; Fultz Decl. at ¶ 12. He decided to research whether he could terminate Plaintiff lawfully. Ward Decl. at ¶ 15. In November 2013, Underwood researched the matter and prepared a memorandum, which concluded that Plaintiff was a "policymaker," who could be lawfully terminated for her support of her husband's campaign. UMF 32; Doc. 15-1, Ex. II. Fultz and Ward reviewed the memorandum and concurred with its conclusion. Ward Decl. at ¶ 15; Fultz Decl. at ¶ 12. The executive management team members conferred and agreed that Plaintiff should be terminated because, in their view, her presence negatively affected the management team in general and the team's meetings in particular. Ward Decl. at ¶ 17; Fultz Decl. at ¶ 12; French Decl. at ¶¶ 4-5; Underwood Decl. at ¶ 13.[15]

At Ward's direction, Plaintiff was terminated on December 3, 2013. Ward Decl. at ¶ 18. Underwood personally presented the "Notice of Termination" to Plaintiff on that day. Underwood Decl. at ¶ 14. Plaintiff asked if she could resign instead of being terminated, which was acceptable to Underwood. Underwood Decl. at ¶ 14. Plaintiff submitted her letter of resignation shortly afterward, which Underwood accepted on December 4, 2013. Doc. 15-1, Ex. AA at 1.

After Plaintiff left the Office, management team meetings changed. According to Ward, "candid and open discussions . . . were restored," and "SDDAs no longer sought separate meetings with the ADAs and [him] to discuss confidential matters." Ward Decl. at ¶ 19. Other management team members thought the meetings became more productive and efficient and that the discussions became more open and candid. *See, e.g.*, French Decl. at ¶ 5; Alavezos Decl. at ¶ 8; Cardenas Decl. at ¶ 4; Lopez Decl. at ¶

---

numerous members of the team did not trust her and felt like they could not share confidential information with her. *See* Fed. R. Evid. 801(c); *United States v. Payne*, 944 F.2d 1458, 1472 (holding out-of-court statement offered to show the effect on the listener was not hearsay). Further, the Court specifically OVERRULES Plaintiff's numerous objections to the declaration testimony of Fultz, Ward, Alavezos, Cardenas, Lopez, Lightfoot, and Greaver that, as management team members, they did not trust Plaintiff with confidential and sensitive information about the Office due to Mr. Kaelble's running for DA.

[15] Plaintiff testified that she did not observe "any difference at the meetings" after Mr. Kaelble's election became known. *See* Kaelble 122:2-7. This does not create a factual dispute as to whether management team members claimed to have observed otherwise, nor does it put into dispute their testimony that they felt they could not be candid in Plaintiff's presence because they considered her untrustworthy.

1   5; Lightfoot Decl. at ¶ 6; Underwood Decl. at ¶ 15; Greaver Decl. at ¶ 8.

2       Plaintiff brought this case against Ward and the County under § 1983, alleging that they

3   terminated her for her support of Mr. Kaelble's campaign in violation of her First Amendment rights.

4   *See* Doc. 1 at 14; Doc. 29 at 5 (Plaintiff arguing Ward terminated her "because she publicly supported

5   Ward's opponent in the 2014 election").[16] Defendants now move for summary judgment on the claim.

6   They assert, among other things, that they were entitled to terminate Plaintiff—even for entirely political

7   reasons—because of her status as a "policymaker" and "confidential employee."[17]

8                           **IV. <u>STANDARD OF DECISION</u>**

9       Summary judgment is appropriate when there is no genuine issue as to any material fact and the

10  moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, a

11  court's function is not to weigh the evidence and determine the truth but to determine whether there is a

12  genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must

13  draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility

14  determinations or weigh the evidence. *See id.* at 255; *see also Reeves v. Sanderson Plumbing Prods.,*

15  *Inc.*, 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is merely colorable or is not

16  significantly probative, summary judgment may be granted. *See id.* at 249-50. A fact is "material" if its

17  proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317,

18  322-23 (1986). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return

19  a verdict for the nonmoving party." *Id.* at 248. "Where the record taken as a whole could not lead a

20  _____

21  [16] As noted above, Plaintiff brought other causes of action that are no longer at issue.

22  [17] As discussed below, the Court agrees with Defendants and, for that reason, they are entitled to summary judgment on
    Plaintiff's § 1983 claim. But to reach the merits of that argument the Court must address threshold arguments the County
    makes as to its liability. First, the parties correctly note the County is liable under § 1983 only if the County ratified Ward's

23  conduct or Ward was a "final policymaker" whose actions represent official County policy. *See generally City of St. Louis v.
    Praprotnik*, 485 U.S. 112, 123, 127   (1988). Second, the County appears to argue, albeit indirectly, that Plaintiff's First
    Amendment rights were not implicated because she voluntarily resigned. The Court assumes without deciding that Ward was

24  a final policymaker and therefore need not address Plaintiff's argument that the County ratified his conduct. Ward's
    testimony that, in his opinion, Plaintiff was involuntarily terminated creates a genuine issue of material fact as to whether she

25  resigned or was terminated involuntarily. *See* Ward Depo. at 86: 2-3 ("And my belief, her termination was involuntary.").
    The Court therefore assumes without deciding that Plaintiff's termination was involuntary.

1  rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*

2  *Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

3      The moving party bears the initial burden of informing the Court of the basis for its motion, and

4  of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a

5  genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial

6  burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set

7  forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See*

8  Fed. R. Civ. P. 56(c); *Liberty Lobby*, 477 U.S. at 250.

9                              **V. <u>ANALYSIS</u>**

10  **A.     First Amendment Retaliation.**

11      To establish a prima facie case of First Amendment retaliation, a government employee must

12  show that "(1) she engaged in protected speech; (2) the defendants took an 'adverse employment action'

13  against her; and (3) her speech was a 'substantial or motivating' factor for the adverse employment

14  action." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir.2004) (quoting *Coszalter v. City of*

15  *Salem*, 320 F.3d 968, 973 (9th Cir. 2003)).

16      To the extent Defendants suggest Plaintiff's support of Mr. Kaelble's candidacy for DA

17  concerned an entirely personal matter because he is her husband, the Court disagrees. It is beyond

18  dispute that Plaintiff's First Amendment rights were implicated when she was terminated, in part, for her

19  supporting her husband's candidacy for the DA position. *See Bardzik v. Cty. of Orange*, 635 F.3d 1138,

20  1144 (9th Cir. 2011) ("The First Amendment protects the rights of citizens . . . to support a candidate

21  opposing an elected official." (citation and footnote omitted)); *Rutan v. Republican Party of Ill.*, 497

22  U.S. 62, 69 (1990) (holding that the First Amendment protects "joining, working for or contributing to

23  . . . candidates of their own choice"). In fact, First Amendment protections have their "fullest and most

24  urgent application" to speech connected to "campaigns for political office." *Monitor Patriot Co. v. Roy*,

25  401 U.S. 265, 272 (1971). That Mr. Kaelble is Plaintiff's husband is beside the point—her support for

his campaign is entitled to First Amendment protection.

There is no dispute that Plaintiff suffered an adverse employment action, but the County does argue that Plaintiff's support for Mr. Kaelble's campaign was not the motivating factor in Ward's decision to terminate Plaintiff. Motive, however, "is purely a question of fact." *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009). For that reason, "very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1127 (9th Cir. 2009) (citation and quotation marks omitted).

Viewing the evidence in the light most favorable to Plaintiff, the Court finds there is a genuine issue of material fact as to why Ward terminated Plaintiff. Ward candidly testified that Plaintiff's support for Mr. Kaelble's campaign was "a key factor" in his decision to terminate her. Ward Depo. at 23:5-10. Whether it was a key factor because of the perceived effect her support had on the Office, as the County argues, or whether Ward terminated Plaintiff simply because he disapproved of her support for Mr. Kaelble, as Plaintiff argues, is a question of fact that cannot be resolved on summary judgment. *See Eng*, 552 F.3d at 1071.

**B.      Exceptions to First Amendment Protection for Retaliation.**

Nonetheless, as the Supreme Court observed days ago, there are narrow exceptions to the Constitution's prohibition on "discharging or demoting an employee because the employee supports a particular candidate." *Heffernan v. City of Paterson*, 578 U.S. __, slip op. at 3 (2016) (citations omitted). One of these exceptions is under *Elrod v. Burns*, 427 U.S. 347 (1976), which provides that "a public official who is a 'policymaker' may be fired for political reasons without offending the United States Constitution." *Fazio v. City & Cty. of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997). The exception applies not only to political party affiliation, but also permits terminations premised on "political affiliation, which includes commonality of political purpose and support." *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (9th Cir. 2001). This exception recognizes "that an elected official must

1    be able to appoint some high-level, personally and politically loyal officials who will help him

2    implement the policies that the public voted for." *Bardzik*, 635 F.3d at 1144 (citations omitted).

3    Accordingly, "[a]n elected official may dismiss . . . policymaking employees if they are no longer loyal,

4    if they oppose his re-election, or simply if the official would prefer to work with someone else." *Id.*

5        Another related exception is for government employees who are "confidential employees," and

6    whose positions require confidentiality and loyalty to the elected official.  *See Branti v. Finkel*, 445 U.S.

7    507 (1980); *Hobler v. Brueher*, 325 F.3d 1145, 1152 (9th Cir. 2003). The "confidential employee"

8    exception recognizes that "[a] public agency would be unmanageable if its head had to . . . retain his

9    political enemies . . . in positions of confidence or positions in which they would be . . . exercising

10   discretion in the implementation of policy." *Hobler*, 325 F.3d at 1152 (quoting *Fazio*, 125 F.3d at 1333).

11       Both the policymaker and confidential employee exceptions "take account of 'practical realities'

12   such as the need for 'efficiency' and 'effective[ness]' in government service," *Heffernan*, 578 U.S. __,

13   slip op. at 3, and allow a government employer to "fire a public employee for purely political reasons if

14   the employer can demonstrate that political considerations are 'appropriate requirement[s] for the

15   effective performance' of the job." *Fazio*, 125 F.3d at 1332 (quoting *Branti*, 445 U.S. at 518); *Hobler*,

16   325 F.3d at 1149. These exceptions to the First Amendment for so-called "patronage dismissals"

17   recognize that

18       [i]f a public official is permitted to fire a confidential or policymaking employee merely because
         the latter quietly, inoffensively, undemonstratively belongs to the wrong political party . . . the
19       official should be permitted to fire the same employee when the latter asks the electorate to
         throw the rascal out and put himself into the rascal's office.
20
21   *Fazio*, 125 F.3d at 1332 (quoting *Wilbur v. Mahan*, 3 F.3d 214, 218 (7th Cir. 1993) (footnote omitted)).

22   This is so because forcing "a public official to work towards his or her goals with the assistance of

23   employees who may be working against those goals has the potential to frustrate the will of the

24   electorate." *Nichols v. Dancer*, 567 F.3d 423, 428 (9th Cir. 2009). Accordingly, "an employee's status as

25   a policymaking or confidential employee [is] dispositive of any First Amendment retaliation claim."

1  *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 994-95 (9th Cir. 1999). "If [an official] is a policymaker

2  [or confidential employee], then . . . his government employment could be terminated for purely

3  political reasons without offending the First Amendment." *Fazio*, 125 F.3d at 1332; *Hobler*, 325 F.3d at

4  1154-55.

5        **1.**      **Plaintiff Was a Policymaker.**

6        The County bears the burden of establishing that Plaintiff is a policymaker. *Elrod*, 427 U.S. at

7  368. "[T]he 'policymaker' inquiry is highly fact-specific." *Hunt v. Cty. of Orange*, 672 F.3d 606, 614

8  (9th Cir. 2012). "Determining the particular duties of a position is a factual question, while determining

9  whether those duties ultimately make that position a policymaking . . . .question is a question of law."

10  *Walker*, 272 F.3d at 1132. For that reason, summary judgment may be appropriate "where the duties of

11  the position, insofar as they are material, are not genuinely at issue," and the Court can find as a matter

12  of law that the plaintiff is a policymaker. *Hobler*, 325 F.3d at 1148 (finding genuine issue of material

13  fact as to why plaintiffs were fired but holding their status as policymakers meant their § 1983 claim

14  failed).

15        "[A] public employee need not literally *make* policy in order to fit within the *Elrod* policymaker

16  exception." *Fazio*, 125 F.3d at 1332 (emphasis in original). The Ninth Circuit has developed nine non-

17  exhaustive factors to identify a policymaking position: "vague or broad responsibilities, relative pay,

18  technical competence, power to control others, authority to speak in the name of policymakers, public

19  perception, influence on programs, contact with elected officials, and responsiveness to partisan politics

20  and political leaders." *Fazio*, 125 F.3d at 1334 n.5; *Bardzik*, 635 F.3d at 148 ("[T]he *Fazio* factors are

21  not exclusive"). These "factors are intended to guide the 'policymaker' analysis, but not supplant . . .

22  'the essential inquiry'—whether 'party affiliation is an appropriate requirement for the effective

23  performance of the public office involved.'" *Hunt*, 672 F.3d at 613 (quoting *Fazio*, 125 F.3d at 1331).

24        **a.**      **Vague or Broad Responsibilities**

25        According to Plaintiff, "SDDAs have a broad range of responsibility and must exercise

1  discretion and implement policy in the prosecution of their cases." Kaelble Decl. at ¶ 12. This statement

2  is in line with the SDDA Job Description, which Plaintiff emphasizes as critical, if not dispositive,

3  evidence of an SDDA's responsibilities. Contrary to Plaintiff's assertion, the SDDA Job Description

4  does not outline an SDDA's duties "with precision." Doc. 29 at 17. An SDDA's duties "are not

5  necessarily limited to" the paragraph-long list of duties contained in the SDDA Job Description. By its

6  own terms, that list is non-exhaustive; the SDDA Job Description explicitly states that the "[e]ssential

7  duties may vary from position to position," and SDDAs must "[p]erform duties as assigned." In any

8  event, even assuming the SDDA Job Description provided an exhaustive list of an SDDA's duties, its

9  list of numerous broadly worded responsibilities essentially says SDDAs are responsible for supervising,

10  training, and overseeing subordinate attorneys and doing whatever is needed to prosecute cases. In

11  addition, Plaintiff was responsible for the general oversight and management of an entire division of the

12  Office. Kaelble Depo. at 56:3-5. The Court therefore finds that the first *Fazio* factor weighs in favor of

13  finding Plaintiff is a policymaker.

14  **b.  Relative Pay**

15  The parties provide limited evidence and argument regarding Plaintiff's relative pay. There is not

16  dispute that Plaintiff's salary was "over $100,000 per year" or that an SDDA's salary could be up to

17  $116,000. SDDA Job Description at 1. Plaintiff's salary appears to suggest that Plaintiff is a

18  policymaker. *See Fazio*, 125 F.3d at 1334 (noting plaintiff made over $100,000 per year in finding that

19  he was a policymaker). *Fazio*, however, was decided almost 20 years ago, when $100,000 had the same

20  buying power as approximately $150,000 today. *See* Bureau of Labor Statistics, Consumer Price Index

21  Inflation Calculator, http://www.bls.gov/data/inflation_ calculator.htm. And in *Bardzik*, the Ninth

22  Circuit concluded that a lieutenant in a sheriff's department being paid "only . . . $116,100 a year,

23  whereas an assistant sheriff could earn as much as $260,000" weighed against finding the lieutenant was

24  a policymaker. 635 F.3d at 1146.

25  There is limited evidence concerning Plaintiff's pay relative to Office personnel. ADAs make

1   approximately $100,000 to $150,000 per year, *see* Doc. 29-1, Ex. J at 1, and the DA makes

2   approximately $128,000 to $192,000 per year. *See* Doc. 29-1, Ex. K at 1. An "Attorney IV," who is

3   inferior to SDDAs and has little to no managerial duties, could make up to $104,000. Doc. 29-1, Ex. H

4   at 1. Given the lack of argument and evidence concerning this factor, it is somewhat inconclusive.

5   Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's pay, which

6   is only slightly above that of an inferior "Attorney IV," weighs against finding Plaintiff is a

7   policymaker.

8              **c.   Technical Competence**

9          The Ninth Circuit has not provided much guidance as to what constitutes "technical competence"

10   in the policymaker analysis. But it appears to be simply whether the government employee has skills and

11   expertise specific to the at-issue position.[18] There is no dispute that Plaintiff is a highly skilled,

12   competent attorney with significant experience in the field of criminal law— at the time of her

13   termination, Plaintiff had been at the Office since 1999 and had been a supervisor for over six years. In

14   Fultz's view, Plaintiff's "legal knowledge is excellent and she has an outstanding work ethic," and she

15   "always d[id] very good work."  Doc. 15-1, Ex. W at 2. Plaintiff described herself as "one of the most

16   hardworking, dependable, and knowledgeable supervisors in the [O]ffice." *Id.* at 7. She claims she was

17   "trusted with difficult projects, develop[ed] procedures and policies, and work[ed] on challenging

18   cases." *Id.* The Court therefore finds that the third *Fazio* factor weighs in favor of finding Plaintiff was a

19   policymaker. *See Biggs*, 189 F.3d at 995 ("Cases have considered the fact that the position[s of city

20   attorney, assistant city attorney, and deputy city attorney] require[] technical expertise").

21              **d.   Power to Control Others**

22

23   [18] *See, e.g.*, *DiRuzza*, 206 F.3d at 1316-17 (O'Scannlain, J., dissenting) ("DiRuzza was chosen for this second position
precisely because of the technical competence and expertise she had acquired while working on the federal prison

24   litigation."); *Bardzik*, 635 F.3d at 1147 ("Fourth, Bardzik had particular technical competence to serve as Reserve Division
Commander. Carona hired Bardzik because he recognized that Bardzik was 'somebody with the skills to come forward and
take the Reserve Division and get it back on track.'"); *Walker*, 272 F.3d at 1133 ("Third, the FHF was hired particularly for

25   its technical competence in the area of fair housing.").

1    Although Plaintiff supervised at least six attorneys, she had no authority to hire, fire, promote, or

2    demote anyone at the Office, and there is no evidence that Plaintiff had the authority to discipline her

3    subordinates. Her authority over subordinates was "both limited and largely operational." *Hunt*, 672

4    F.3d at 614. "[M]erely being a supervisor/administrator . . . is not sufficient to show that political

5    affiliation is an appropriate requirement for the job in question." *Id.* (citation and quotation marks

6    omitted). This factor weighs against finding Plaintiff was a policymaker. *See id.* (finding fourth *Fazio*

7    factor was not satisfied when plaintiff could not hire or promote subordinates but could manage and

8    discipline them).

9              **e.       Authority to Speak in the Name of Policymakers/Public Perception**

10   Plaintiff did not have the authority to speak to the media in the name of the DA without approval

11   from a member of the executive management team, which weighs against finding Plaintiff was a

12   policymaker. *See Hunt*, 672 F.3d at 613. But this is outweighed by the fact that Plaintiff routinely and

13   publicly represented the DA by virtue of her position as an SDDA. *See Walker*, 272 F.3d at 1133.

14   Plaintiff had wide latitude in the prosecution of her cases. According to Plaintiff, she had to "exercise

15   discretion and implement policy in the prosecution of [her] cases." Kaelble Decl. at ¶ 12. Plaintiff had

16   discretion to, among other things, determine which cases to file, which charges to bring, and how and

17   when to negotiate plea deals. Kaelble Depo. at 125:20-25. Plaintiff could unilaterally dismiss cases,

18   though generally she would seek approval to do so. *Id.* at 45:21-9.

19   In addition, one of an SDDA's many duties is to "advise the general public and law enforcement

20   officers on criminal proceedings." SDDA Job Description at 1. As such, she "interact[ed] and liaise[d]

21   with representatives of law enforcement agencies on a continual basis." Kaelble Decl. at ¶ 17. For

22   instance, when developing the Office's Prop 36 policies, Plaintiff spoke to the Superior Court, the public

23   defender, and probation on behalf of the Office. Doc. 15-1, Ex. W at 8. And as the coordinator for the

24   Office's conflicts cases, Plaintiff would speak to the DA offices of three or four counties on behalf of

25   the Office to assist the Office and the other counties in resolving their conflicts cases. Kaelble Decl. at ¶

27.

Given this, the Court concludes that "the public would have viewed [Plaintiff] as having some official authority to speak" on behalf of the DA. *Walker*, 272 F.3d at 113. The Court therefore finds that the fifth and sixth *Fazio* factors weigh in favor of finding Plaintiff was a policymaker. *See id.*; *see also Opp v. Office of State's Attorney of Cook Cty.*, 630 F.3d 616, 621 (7th Cir. 2010) ("[A]n Assistant State's Attorney's decisions and actions in the courtroom are binding on the government. The State's Attorney grants an Assistant State's Attorney the authority to conduct a case in court, and, from that point, the Assistant State's Attorney acts as the State's Attorney in all respects. The Assistant State's Attorney may choose to prosecute or dismiss a case, with or without the State's Attorney's input and guidance. This alone raises Assistant State's Attorneys to the level of policymakers.").

### f.    Influence on Programs

Whether Plaintiff had an influence on Office programs is the "most critical factor" in the policymaker analysis. *See Bardzik*, 635 F.3d at 1146. And there is no dispute that Plaintiff influenced Office-wide programs through her formulating, recommending, and implementing Office policies and procedures. That the executive management team ultimately had the final say in deciding which Office policies to employ does not preclude a finding that Plaintiff is a policymaker. *See Elrod*, 427 U.S. at 367 ("In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals."); *Bardzik*, 635 F.3d at 1147 (holding "the ability to 'unilaterally' create and implement programs without any input from the Sheriff is not required by our case law or by logic").

SDDAs must have the ability to "develop, implement, and interpret policies." SDDA Job Description at 1. According to Ward, the management team's "most important" task was "suggesting how [the Office] could do things better." Ward Decl. at ¶ 6. Management team members therefore participate in Office policy discussions and make recommendations to the executive management team members. *See* Greaver Decl. at ¶ 3; Kaelble Depo. at 65:21-66:3. For instance, while an SDDA, Plaintiff

1   was tasked with developing Office-wide policies for Prop 36, Marsy's Law, U Visas, and the Brady

2   Database. *See* UMF 17. Plaintiff also was tasked to ensure the Office's eavesdropping protocol was up

3   to date and in accordance with the law.  Kaelble Decl. at ¶ 24. Because of her involvement with

4   developing the Office's Prop 36 policies, Plaintiff handled all of the Prop 36 petitions in the County for

5   almost a year.  The Court finds that this "most critical" *Fazio* factor weighs heavily in favor of finding

6   that Plaintiff was a policymaker. *See Blanck v. Hager*, 360 F. Supp. 2d 1137, 1150 (D. Nev. 2005)

7   ("Plaintiff's responsibilities of rendering legal opinions, advising Washoe, and representing Washoe in

8   litigation matters is sufficient to establish him as a policymaking or confidential employee."), *aff'd*, 220

9   Fed. App'x 697 (9th Cir. 2007); *Livas v. Petka*, 771 F.2d 798, 801 (7th Cir. 1983) (noting that

10  subordinate prosecutor is relied on by superiors to make decisions that could create policy), *cited with*

11  *approval in Fazio*, 125 F.3d at 1333, and *Biggs*, 189 F.3d at 997.

### g.    Contact with Elected Officials

13  There is no dispute that, as an SDDA and member of the management team, Plaintiff was

14  required to and in fact did have consistent communication and contact with the DA, an elected official.

15  The Court finds this *Fazio* factor weighs in favor of finding Plaintiff was a policymaker. *See Bardzik*,

16  635 F.3d at 1147 ("Third, Bardzik had frequent and meaningful contact with the elected official, the

17  [defendant] Sheriff.").

### h.    Responsiveness to Partisan Politics and Political Leaders

19  The Ninth Circuit has not provided much meaningful guidance on this factor. But the factor

20  appears to require an assessment of the extent to which a government employee accounts and reports to

21  elected officials. *See Hunt*, 672 F.3d at 619 (Leavy, J., concurring in part and dissenting in part)

22  ("Hunt's position required him to be responsive to City Council members and other political leaders in

23  Orange County.").

24  Here, Plaintiff served at the pleasure of the DA. As an SDDA, the DA was Plaintiff's direct

25  supervisor and was expected to follow his directives and implement his policies. As Plaintiff

1   emphasizes, she required Ward's input or approval on numerous decisions. The Court therefore finds

2   this *Fazio* factor weighs in favor of finding Plaintiff was a policymaker.

3                   **i.       Summary**

4           The Court finds that all but two of the *Fazio* factors (relative pay and power over others) support

5   a finding that Plaintiff was a policymaker at the Office. The Court is mindful, however, that the *Fazio*

6   factors should not be applied mechanically or in a vacuum. *Hunt*, 672 F.3d at 612. As the Ninth Circuit

7   has emphasized repeatedly, the "essential inquiry" is "whether 'party affiliation is an appropriate

8   requirement for the effective performance of the public office involved.'" *Id.* at 613 (quoting *Fazio*,125

9   F.3d at 1331). Further, the court has stressed that the policymaker exception includes terminations

10  premised on "'political affiliation,' which 'includes commonality of political purpose and support.'"

11  *Biggs*, 189 F.3d at 996. The ultimate question, then, is whether effective performance as an SDDA

12  required a commonality of political purpose and support with the DA.

13          Just as "[t]here can be no doubt that loyalty and confidentiality are essential to the effective

14  performance of the City Attorneys' office," *Rendish v. City of Tacoma*, 123 F.3d 1216, 1225 (9th Cir.

15  1997), there is no doubt that loyalty and confidentiality among the management team was essential to

16  the effective performance of the Office. Ward, his two ADAs, the Chief Investigator, the Assistant Chief

17  Investigator, three SDDAs, and the director of Victims Services, all of whom are part of the

18  management team, testified that trust and confidence in one another is necessary for the management

19  team to do their jobs collectively and individually. Critically, Plaintiff does not dispute that: (1)

20  confidential matters were discussed at management team meetings; (2) the management team needed to

21  be able to trust and be candid with one another to run the Office efficiently; (3) the DA and members of

22  the management team grew to distrust Plaintiff; (4) she grew to distrust them; and (5) management team

23  members stopped confiding in Plaintiff. *See generally* Kaelble Depo. at 121:15-122:1; Ward Decl. at ¶¶

24  13-14. This mutual lack of trust and confidence between Plaintiff and management team members

25  caused management team meetings to be less productive, forced management team members to make

1  different meeting arrangements, and sometimes led Plaintiff to be ill-informed (or not informed at all)

2  about Office matters. *See* Ward Decl. at ¶ 14; Fultz Decl. at ¶ 12.

3       The Court notes that the overwhelming majority of the numerous courts to consider the issue

4  have found that government attorneys are policymakers.[19] The Court concludes that political

5  considerations—namely, Ward's and the management team's need for trust and confidence in

6  Plaintiff—were appropriate requirements for the effective performance of Plaintiff's job as an SDDA.

7  *See Fazio*, 125 F.3d at 1332; *Hunt*, 672 F.3d at 612 (noting that position that requires trust and

8  confidence supports a finding the position is policymaking). Plaintiff served as an advisor to the DA and

9  his executive management team, as well as an Office liaison to both the attorneys she supervised and

10  various public agencies and representatives. Ward and the management team depended on her to help

11  formulate and implement Office policies. She had wide discretion in bringing, charging, and prosecuting

12  cases and running her division. "It is difficult to fathom how such responsibilities can be undertaken and

13  done well without [her] political or social philosophy [making] a difference in the implementation of

14  programs." *Gordon v. Cty. of Rockland*, 110 F.3d 886, 890 (2d Cir. 1997).

15       Ultimately, whether Plaintiff's support for her husband's election had any *actual* effect on the

16  Office, the management team, or Plaintiff's ability to do her job is beside the point. *See Bardzik*, 635

17  F.3d at 1144 ("An elected official may dismiss . . . policymaking employees . . . simply if the official

18  would prefer to work with someone else." (citations omitted)). Ward was entitled to work with "high-

19  level, personally and politically loyal officials who will help him implement the policies that the public

20  voted for." *Bardzik*, 635 F.3d at 1144. "Fewer acts convey greater opposition to an elected supervisor's

21

22  [19] *See, e.g.*, *Aucoin v. Haney*, 306 F.3d 268, 275 (5th Cir. 2002) ("The other circuits that have addressed the *Elrod–Branti* exception in the context of government attorney dismissals, whether for assistant district attorneys or other government attorneys, have held that these attorneys occupy positions requiring political loyalty and are not protected from political dismissals under the First Amendment."); *Biggs*, 189 F.3d at 995-96 ("Many cases have addressed the role of attorneys in

23  city government, and almost all of them have found such attorneys to be policymakers subject to patronage discharges" (collecting cases)); *Gordon v. Cty. of Rockland*, 110 F.3d 886, 890-91 (2d Cir. 1997) ("'All circuit court decisions—and almost all other court decisions—involving attorneys in government service, other than public defenders, have held that

24  *Elrod/Branti* do not protect these positions.'" (citation omitted)); *Williams v. City of River Rouge*, 909 F.2d 151, 155 (6th Cir. 1990) ("[C]ourts that have decided whether city and county attorneys are ... protected [under the First Amendment against

25  politically-motivated dismissal] have almost uniformly found that they are not.").

1  policies than actively campaigning for a rival candidate." *DiRuzza*, 206 F.3d at 1317 (9th Cir. 2000)

2  (O'Scannlain, J., dissenting) (footnote omitted). "'It would strain credulity to read the First Amendment

3  or *Elrod* to require an elected official to work in constant direct contact with a person viewed as a

4  political enemy.'" *Hobler*, 325 F.3d at 1153 (quoting *Vasquez Rios v. Hernandez Colon*, 819 F.2d 319,

5  323 (1st Cir. 1987)).

6      Accordingly, because Plaintiff was a policymaker, Ward's terminating Plaintiff did not violate

7  the First Amendment. The Court therefore GRANTS the County's motion for summary judgment on

8  Plaintiff's § 1983 claim in its favor and against Plaintiff.

9      **2.    Plaintiff Was a Confidential Employee.**

10     "[A]n employee's status as a policymaking *or* confidential employee would be dispositive of any

11  First Amendment retaliation claim." *Biggs*, 189 F.3d at 994-95 (emphasis added). Although the County

12  emphasized its position that Plaintiff was a policymaker, it also argued that she was a confidential

13  employee. *See* Doc. 14 at 9, 11, 25, 26; Doc. 30 at 2. Plaintiff, however, does not address this argument

14  in her opposition; she only addresses the County's argument that she was a policymaker. For that reason

15  alone, the County arguably is entitled to summary judgment on Plaintiff's claim.[20] Nonetheless, the

16  Court addresses the issue on the merits.

17     "The test for whether someone is a 'confidential employee' in the *Branti* sense is simply whether

18  political loyalty, or the absence of political adverseness, is 'an appropriate requirement for the effective

19  performance of the public office involved.'" *Hobler*, 325 F.3d at 1154. To make that assessment, the

20  _____

21  [20] *See Cunningham v. Tenn. Cancer Specialists, PLLC*, 957 F. Supp. 2d 889, 921 (E.D. Tenn. 2013) ("It is well under . . . that
    when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a
22  court may treat those arguments that the plaintiff failed to address as conceded.") (citation and quotation marks omitted)
    (collecting cases)); *Samper v. Providence St. Vincent Med. Ctr.*, 2010 WL 3326723, at *16 (D. Or. Aug. 23, 2010)
23  ("[plaintiff] does not address this argument in her opposition and, thus, she appears to concede that she is unable to state a
    claim"), *aff'd*, 675 F.3d 1233 (9th Cir. 2012); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F.Supp.2d 154, 159
24  (D.D.C. 2002) ("[i]f a party fails to counter an argument that the opposing party makes in a motion, the court may treat that
    argument as conceded"); *cf. Blanck v. Hager*, 220 Fed. App'x 697, 698 (9th Cir. 2007) ("Because Blanck has failed in both
    his opening and reply brief to challenge the district court's dispositive determination that, as a matter of law, he is a
25  confidential employee and because he has not responded to the Appellees' argument that he is a confidential employee under
    *Hobler*, he has forfeited an issue that is dispositive of his entire First Amendment claim.").

court must ask:

> (1) how closely does the person work with the official? (2) does the person's job require personal loyalty to the official? (3) is the office so small that the relationship is necessarily close, or so large that it isn't? (4) does the official rely on the person for information about delicate matters within the office or communications with the public or other officials on behalf of the official? (5) would the official's ability to manage relationships with office staff or persons with whom the office deals be impaired if the persons are politically loyal to an adversary or not loyal to him? (6) were the dismissals of only one or a small number of employees who worked most closely with the policymaker, or were they wholesale dismissals? (7) do the individuals speak to other employees, the public and to other policymakers on behalf of the official?

*Id.* at 1154-55. Like the *Fazio* factors employed in the policymaker analysis, these questions only guide the Court's analysis. *See id.* at 1154 ("[N]either a multifactor 'test' nor an exhaustive and exclusive list of factors is appropriate."). The Court, however, is unaware of any subsequent decision that has employed these questions to determine whether a position is that of a confidential employee.

As discussed in more detail above, the answer to all the *Hobler* questions except (6) is "yes."[21] Plaintiff worked closely with Ward. Although the Office has over 200 employees and approximately 65 attorneys, Plaintiff was part of the Office's management team, which included, at most, 18 people. *See* Kaelble Decl. at ¶ 10. The team met in confidential, face-to-face meetings and at times discussed sensitive, important, or confidential information concerning the Office, its personnel, its policies, and its plans. Ward required and relied on the input of the management team members to run the Office. SDDAs, including Plaintiff, advised the DA, developed and recommended Office policies, managed entire Office divisions and subordinate attorneys, and "implement[ed] policy in the prosecution of their cases." Kaelble Decl. at ¶ 12. As an SDDA, Plaintiff represented the Office in the courtroom and spoke to various law enforcement agencies and entities when executing, implementing, and developing Office policies.

Simply put, the undisputed evidence in this case shows that Ward and members of the management team, including Plaintiff, needed to maintain mutual trust and confidence to run the Office.

---

[21] Ward only terminated Plaintiff, Mr. Kaelble, and former ADA Shani Jenkins. UMF 4.

1  But because of Plaintiff's support for Mr. Kaelble's campaign, Ward and members of the management

2  team did not confide in nor trust Plaintiff, and she did not trust them. This lack of trust and confidence

3  hindered the management team's ability to perform their jobs collectively and individually.

4        The Court therefore finds Plaintiff was a confidential employee, who could be terminated for

5  political reasons without violating the First Amendment. *See Hobler*, 325 F.3d at 1155; *Livas*, 711 F.2d

6  798 (prosecutor's lack of confidence in subordinate "for whatever reason" is sufficient reason to

7  terminate subordinate). Accordingly, the Court GRANTS the County's motion for summary judgment

8  on Plaintiff's § 1983 claim in its favor and against Plaintiff.

9  ## VI. <u>CONCLUSION AND ORDER</u>

10        Because Plaintiff's position as an SDDA in the Office was that of a confidential, policymaking

11  employee, Ward's terminating her for supporting her husband's campaign to replace Ward as DA did

12  not violate the First Amendment. Accordingly, the Court GRANTS the County's motion for summary

13  judgment on Plaintiff's § 1983 claim—the only claim remaining in this case. The Clerk of Court is

14  therefore directed to CLOSE this case.

15

16  IT IS SO ORDERED.

17    Dated:  __May 11, 2016__          __/s/ Lawrence J. O'Neill__

18                                          UNITED STATES CHIEF DISTRICT JUDGE

19

20

21

22

23

24

25